[Civ. No. 24233. Second Dist., Div. One. Apr. 26, 1960.]

## CASMALIA SCHOOL DISTRICT, Appellant, v. BOARD OF SUPERVISORS OF SANTA BARBARA COUNTY, Respondent.

William Ward Reid for Appellant.

Vern B. Thomas, District Attorney, Frank J. McCarthy, Assistant District Attorney, and Carroll Barrymore, Deputy District Attorney, for Respondent.

FOURT, J.—This is an appeal from a judgment of the Superior Court of Santa Barbara County, dismissing an alternative writ of mandate and denying a peremptory writ of mandate sought by Petitioner and Appellant, Casmalia School District (sometimes hereinafter referred to as ''School District''), against Respondent, Board of Supervisors of the County of Santa Barbara (sometimes hereinafter referred to as ''Board''), to compel said Board to sell an $80,000 bond issue of the School District, and to have declared invalid a change of boundaries of the School District ordered by said Board.

The first count of the petition for writ of mandate sought to compel said Board to sell the school bonds, and the second count to have declared invalid an order of said Board changing the School District boundaries. This action was heard by the trial court sitting without a jury.

A résumé of the facts is as follows:

*October* 26, 1957: The Santa Barbara County Committee on School District Organization was requested to conduct a study of the Casmalia School District regarding the advantages and disadvantages of a unification of the Casmalia School District with the Orcutt Union School District. The request was made by the Board of Trustees of the Casmalia School District.

*November* 4, 1957: The Committee accepted the request for study at its regular meeting.

*November* 26, 1957: The first of three required public meetings to study the Casmalia problem was held at the Casmalia school.

*January* 23, 1958: The second of the required public meetings was held.

*March* 8, 1958: The third and final meeting was held.

*March* 12, 1958: The Board of Trustees of Casmalia School District adopted a resolution calling a school bond election for May 20, 1958, said bonds to be in the amount of $80,000.

*April* 14, 1958: The County Committee on School District Organization issued its summary and recommendation wherein it stated:

"The Santa Barbara County Committee on School District Organization recommends that the Casmalia School District Trustees request annexation to the Orcutt Union School District."

*May* 8, 1958: A petition, hereinafter called the "Muscio petition," was presented to the County Superintendent of Schools.

*May* 9, 1958: A letter and the Muscio petition were presented to the Board of Supervisors by the County Superintendent of Schools with his recommendations.

*May* 12, 1958: The letter and Muscio petition were filed by the County Clerk and ex-officio Clerk of the Board of Supervisors.

*May* 19, 1958: The Board of Supervisors sent the Muscio petition to the District Attorney's Office for study and comment as to whether a public hearing on the petition was advisable.

*May* 20, 1958: The Casmalia School District held its bond election.

*May* 28, 1958: The Board of Trustees of Casmalia School District requested the Board of Supervisors to sell the bonds voted upon in the election.

*June* 2, 1958: The Board of Supervisors continued the matter of the request of the Board of Trustees of Casmalia School District to sell said bonds to June 9, 1958. It was stipulated by the parties that the bond proceedings were properly conducted and held and properly certified as required by law.

*June* 6, 1958: The District Attorney's Office rendered its opinion that a public hearing on the issue of the Muscio petition would be proper and desirable.

*June* 9, 1958: The Board continued the matter of the request of Casmalia School District for the sale of bonds until Monday, July 21, 1958.

*June* 19, 1958: Notice of public hearing on the petition requesting change of boundary of Casmalia School District and Orcutt Union School District was officially given by the County Superintendent of Schools' Office. The notice was filed June 23, 1958.

*July* 21, 1958: Prior to this date, affidavits, both advocating and opposing withdrawal of the territory included in the Muscio petition, were received by the Board of Supervisors. In all, 76 residents and property owners of Casmalia School District filed affidavits with the Board opposing the change of boundaries. Affidavits signed by property owners in the area to be annexed in favor of the annexation proceedings were also received by the Board.

*July* 21, 1958: The hearing on the Muscio petition by the Board was begun by listening to William Ward Reid, counsel for Appellant, who represented certain individuals residing in the Casmalia School District who were opposed to the annexation. Proponents of the annexation also appeared.

*July* 28, 1958: The hearing, which had been continued from the preceding week was considered further. The matter was then continued until July 29, 1958.

*July* 29, 1958: The Board of Supervisors passed a resolution approving the annexation.

During the school year 1957-1958, there were approximately 54 pupils within Casmalia School District. The assessed property valuation during that period for tax purposes was $1,632,780. After annexation was effected, there were 50 pupils within the remaining Casmalia School District, four pupils residing in the annexed territory, and a taxable assessed valuation of approximately $50,000 of the remaining district. It was stipulated that the pupils remaining in the

Casmalia School District were residents of the district and were citizens of the United States.

In the findings of fact, the trial court found among other things that even after the change in boundaries, there remained sufficient territory and revenue to maintain the existing school within the Casmalia School District (i.e., the district was not made insolvent). Finding Number IV with reference to the second cause of action provides in pertinent part as follows:

"IV

". . . The court finds that among other remedies of courses of procedure open and available to Petitioner (School District) are the following:

"(a) Raising the tax rate sufficiently to maintain Petitioner's school;

"(b) Annex Casmalia School District to another school district within the public school system under the provision of Section 2502 et seq., Education Code (*Note*: Now Section 1791);

"(c) The school children and pupils residing within Casmalia School District may attend a school of another district in the public school system under the provisions of Section 1503 of the Education Code (*Note*: Now Section 10801); or

"(d) Petitioner may apply for emergency funds for the operation and minatenance (*sic*) of the school pursuant to Chapter 5 of Division 3, Education Code as supplemented by Title 5, California Administrative Code, Section 1470, et seq."

The trial court also found that the Board did have discretion, power, authority and jurisdiction to pass and adopt its resolution making the change of boundaries.

Appellant asserts two major contentions. First, that "the Board of Supervisors acted in abuse of its discretion, arbitrarily, unconstitutionally and in excess of jurisdiction in ordering the boundary change." Second, assuming the validity of the boundary change, ". . . the change of boundaries does not become effective until July, 1960, and that meanwhile the Board of Supervisors is required by law to sell the school bonds."

Appellant contends that the County Committee on School District Organization and not the Board of Supervisors, had jurisdiction to change the boundaries of Casmalia School District. It is also stated that "prior to the filing of the Muscio petition with the Board of Supervisors, *formal proceedings* to change (the boundaries) were *pending* before the Santa

Barbara County Committee on School District Organization pursuant to Education Code Sections 4901, etc.'' (Emphasis added.)

The court in *Schohr* v. *Polk,* 104 Cal.App.2d 233 [231 P.2d 164] in discussing the Education Code, division 2, chapter 16 (i.e., now division 5, chapter 9 thereof) stated at page 237 that:

''. . . chapter 16 established a new and *additional* procedure for accomplishing the same results that may be accomplished under procedures set forth in the older sections of the Education Code, and that the later procedure is not intended to replace entirely the older procedures, but may be used in lieu thereof, it is clear that the several procedures are not irreconcilable, . . .''

The court also stated at page 235:

''The title to said chapter 16, division 2 of said code, 'Optional Reorganization of School Districts by Electors,' leaves small room for doubt regarding the purpose and intent behind its adoption. . . . Provision is first made for the creation of local survey committees to study their respective areas and formulate plans and recommendations for the unification or other reorganization of school districts within such areas. (§§ 4901-4904.) Next the resulting plans and recommendations, if any, of these local committees are to be reviewed by the State Board of Education, and, if approved by that board, notice shall be given to the local supervisors, and after public hearings are had, the proposal shall be voted upon at a special election held in the district or districts affected. (§§ 4911-4912.) Furthermore, if the majority of the electors vote in favor of the plans and recommendations, the board of supervisors of the county in which the area is located are to cause an entry of that fact to be entered in the minutes and the reorganization shall be deemed accomplished. (§ 4919.)''

Appellant seemingly contends that the mere undertaking of a study by a Committee on School District Organization, without further action (i.e., without sending the recommendations to the State Board of Education), in and of itself vests sole and exclusive jurisdiction in the body. Such an interpretation would tend to defeat rather than further the legislative intent. The fact that the Legislature provided for more than one means of obtaining changes manifestly indicates that changes were to be facilitated, not impeded. To adhere to appellant's interpretation could result in a freezing

of the status quo even though no further action was contemplated by the committee to effectuate the desired changes in boundaries. An examination of the record discloses that nothing other than the making of a survey was contemplated by the County Committee on School District Organization. The testimony of Mr. Fred Greenough who is the Administrative Assistant to the Superintendent of Schools in Santa Barbara and also the "recorder" with the Santa Barbara County Committee on School District Organization is in part as follows:

"Q. BY MR. BARRYMORE: Mr. Greenough, after the completion of the County Committee on School District Organization, was any action taken by either the Committee or your office, in referring the recommendations of the Committee to the State Department of Education? A. No, sir.

"Q. Was there ever intended for that action to take place?

"MR. REID: Object to that as calling for the conclusion of the witness.

"THE COURT: Sustained.

"Q. BY MR. BARRYMORE: Has there ever been since that time any action taken by either the County Committee or the State Board—excuse me, the County Committee, or, County Superintendent of School's Office, to certify that to the State Department of Education? A. No. It was never intended that they should be.

"MR. REID: Move to strike the latter portion of the answer.

"THE COURT: Other than the answer 'No,' the rest of it may go out."

The material contained in the "exhibits" which were before the trial court and which have been brought before this court support the conclusion that only a *survey* was contemplated by the Committee.[1]

 The public schools are a matter of statewide rather

[1] A letter dated October 26, 1957, from Mr. Don Soule, Principal of the Casmalia School, sent to Mr. Arne J. Madsen, Santa Barbara County Committee on School District Reorganization, states as follows:

"I am writing this letter to you on behalf of our Board of Trustees and members of the community. We would like to have your committee *make a study of the advantages and disadvantages in the unification* of our district with the Orcutt School District. (Emphasis added.)

"If your committee can put our survey on your agenda for November we would appreciate being able to attend your next meeting."

The November 4, 1957, "Report of Meeting of Committee on School District Organization" provides in pertinent part as follows:

"CASMALIA SCHOOL DISTRICT REQUEST

"Mr. Don Soule of Casmalia reviewed the reasons for requesting the

than local concern and the Legislature is given comprehensive powers in this area. ▮▮ School districts are state agencies for the local operation of the school system. (*Hall* v. *City of Taft*, 47 Cal.2d 177 [302 P.2d 574].) The Legislature has delegated the local functioning to local agencies. Section 2532 of the Education Code (i.e., now § 1812 of said Code) which deals among other things with change of boundaries provides:

"§ 2532: *Jurisdiction of county board of supervisors. Upon the filing with it of the petition,* the recommendations, notice, and affidavit, *the board of supervisors has jurisdiction to hear and determine the petition.*" (Emphasis added.)

Section 2502 of the Education Code (i.e., now § 1791 thereof), deals with the requirement of the petition and provides:

"§ 2502: *Petition of electors; required number. The boundaries of a school district may be changed only when at least 25 percent of the registered electors, residing in the territory to be transferred* from one district to another district by the proposed change of boundaries, *present to the superintendent of schools a petition setting forth the changes of boundaries desired, and the reasons for the changes, . . .*" (Emphasis added.)

As indicated in the facts heretofore mentioned, on May 8, 1958, the "Muscio petition" was presented to the county superintendent of schools, and on the next day, May 9, the petition was presented to the board of supervisors by the county superintendent of schools with his recommendations.

County Committee *to study the district organization.* Casmalia district school building is old and in need of major renovation. Some indication of a growth problem from Camp Cooke reactivation. Board members desire to consider all information before making a final decision. Includes possibility of annexation to Orcutt district. (Emphasis added.)

"After some discussion, motion was made by Mr. Campbell, seconded by Mrs. Harder *that the County Committee undertake a study of the Casmalia district as requested.* (Emphasis added.)

"Unanimously approved."

The January 23, 1958, "Report of Second Meeting of Augmented Committee on Casmalia Study" provides in part as follows:

"CALL TO ORDER Chairman Madsen called the meeting to order at 8:15 P.M.

". . . . . . . . . . . . .

"Mr. Madsen then made some remarks in clarifying the purpose and function of the augmented committee in the Casmalia study. *He pointed out the committee had no direct authority; that it was a fact finding committee; and that its findings would be reported to the Casmalia Board of Trustees and school patrons upon completion of its investigation. Final decision as to any change in district status was the sole responsibility of the Casmalia citizens.*" (Emphasis added.)

Mrs. Peterson testified[2] that the petition did contain the required signatures.

 Appellant also asserts that "The Board of Super-

[2]TESTIMONY OF ELINOR JOY PETERSON:
She is employed by the County Superintendent's office as Secretary to the Administrative Assistant. She was testifying in relation to the "Muscio Petition." On direct examination she testified in part:

"Q. And the original petition did contain the signatures as indicated on this document, did it not? A. Yes, it did.

"Q. Now you made certain photostats of that petition, did you not? A. Thermofax copies, yes.

"Q. And is that the type of procedure,—process, that does not take ink signatures or ball point signatures? A. Doesn't pick up all ink signatures; sometimes it's very faint.

"Q. Yes, and you made Thermofax copies of this petition and mailed them to,—one copy you mailed to the Board of Trustees of the Casmalia School District, did you not? A. Yes.

" . . . . . . . . . . .

"Q. When it comes from the Thermofax copy, those signatures were not legible, were they?

" . . . . . . . . . . .

"A. I wrote some off for our benefit in the office so that we would have the names clearly written, spelled, and so forth, for our copy, but I don't remember whether I wrote them off for the School District or not.

"Q. BY MR. REID: So the copy of this petition that you mailed to the Casmalia School District —— A. That is my handwriting, yes.

"Q. (Continuing)—did, or did not contain legible signatures? A. I don't know. I don't remember.

" . . . . . . . . . . .

"Q. . . . Do you recall Mr. Wollam's coming into the County Superintendent's office with this petition? A. Yes.

" . . . . . . . . . . .

"Q. Don't you recall, Miss Peterson, that after the petition was mailed, Mr. Wollam came to your office? A. Is that when he came?

"Q. And told you that the signatures weren't legible, and asked you to write in those signatures? A. I believe that is the way it was. I am not real sure. I don't remember that that's exactly the way it was. I think that is right, though. I don't know.

"Q. That petition that you mailed to the Casmalia School District, did it have the words at the bottom of it 'Section 2501 of the California Education Code,' or did it have, as shown here, 'Section 2502 of the California,—of the Education Code?' A. I believe that copy was corrected before it was sent out to the School District."

CROSS-EXAMINATION OF MISS PETERSON:
BY MR. MCCARTHY:

" . . . . . . . . . . .

"Q. I will show you this letter which appears to be a carbon copy, dated May 12, 1958, . . .

" . . . . . . . . . . .

"Q. Do you recognize that letter and those initials? A. Yes.

" . . . . . . . . . . .

"Q. Was that letter and the original thereof typed by you on or about the date it now bears, to wit, May 12, 1958? A. Yes.

"Q. Was the original of that letter sent with the original petition or the copy thereof, which is Petitioner's Exhibit 7? A. Yes.

" . . . . . . . . . . .

"Q. Were they (i.e., the letter and petition) ever returned unclaimed? A. Oh, no."

visors had no jurisdiction to act on the Muscio petition because a true copy of the Muscio petition was not mailed to or received by the Board of Trustees of Casmalia School District.''

Mrs. Mary W. McWilliams who is Secretary of the Board of Trustees of the Casmalia School District testified that the copy of the Muscio petition received by said Board of Trustees contained signatures which were not legible.[3] The testimony

[3]TESTIMONY OF MRS. MARY W. McWILLIAMS:

She testified on direct examination in part as follows:

''Q. Mrs. McWilliams, turning to a document marked 'Petition, filed May 12, 1958, to the Board of Supervisors'—and signed by one Ted H. Muscio, with a notation on it that the original petition was destroyed, damages by duplicating fluid, signed by the Deputy Clerk,——

''MR. MCCARTHY: And the date that's on there, which you didn't read —put that in the record, will you? 'Destroyed by duplicating fluid, May 15, 1957.'

''MR. REID: That's correct, and as I understand, counsel, there is no argument, and you will stipulate that this is the Petition that instituted the Change of Boundary Proceedings by the Board of Supervisors?

''MR. MCCARTHY: We so stipulate.

''Q. BY MR. REID: Now, Mrs. McWilliams, as Secretary of the Board of Trustees of the Casmalia School District, did you receive in the mail, mailed to the Board of Trustees, a document entitled 'Petition,' and notarized, as this document is notarized, if you recall? A. Well, the signatures on the one we received, we couldn't read them.

''Q. In other words, you received a petition similar to this except that the signatures were not legible? A. Yes.

'' . . . . . . . . . . . . .

''Q. At the bottom of the document it reads: 'Section 2502 of the California Education Code.'

''Was there a different number there on the petition you received? A. 2501, I believe.

'' . . . . . . . . . . . . .

''THE COURT: Are you sure?

''THE WITNESS: I couldn't say positive.

'' . . . . . . . . . . . . .

''Q. Did you receive any other copy of the petition, this petition, other than the one you've testified to? A. We received only one copy.''

TESTIMONY OF FRED GREENOUGH:

Mr. Greenough is the Administrative Assistant to the Superintendent of Schools in Santa Barbara and also serves as the recorder with the Santa Barbara County Committee on School Districts reorganization.

''Q. BY MR. REID: Now, Mr. Greenough, referring to Petitioner's 7 for identification (i.e. the Muscio Petition), I ask you to look at that document. A. Yes.

''Q. Subsequent to the mailing of that document to the Casmalia School District, did you see that again in your office? A. I did.

''Q. Who brought it in? A. Mr. Wollam.

''Q. At the time you saw the document, did the signatures as they now appear upon Petitioner's 7 appear on that document that you saw? A. No, they did not. That was the reason he brought it in.

''Q. What did you do to that? A. He, Mr. Wollam, asked me if he couldn't have a better, *more legible copy*, and I instructed my secretary to copy the names and addresses off of the original, which she did.

''Q. And that's Mrs. Petersen? A. Mrs. Petersen.''

of Mrs. Peterson shows that the copy of the petition sent to the Board of Trustees was a "thermofax copy" and that thermofax doesn't pick up all of the ink signatures. Her testimony also indicates that a Mr. Wollam (the record does not indicate that Mr. Wollam is in anyway connected with Mrs. Wollam, Chairman of the Board of Trustees), came into the County Superintendent's office with a copy of the petition and had the signatures made legible.

Appellant contends that the principle established in *Peter v. Board of Supervisors*, 78 Cal.App.2d 515 [178 P.2d 73] is controlling in the case at bar. In the Peter case, the petition was *not signed* by the requisite number of electors. The court correctly held that the petition was insufficient to confer any jurisdiction on the board of supervisors to act on it. In the case at bar, the petition *was signed* by the requisite number of electors. The thermofax process simply failed to *legibly reproduce the signatures that did appear*. There is a great difference between total absence of signatures and presence of illegible signatures. The Board of Supervisors had jurisdiction to hear and determine the petition and the trial court so found.

Appellant's next point is that "The findings of the Trial Court that the Board of Supervisors did not act in abuse of discretion, arbitrarily or in excess of its jurisdiction is not supported by the evidence."

The "jurisdictional" aspects have been dealt with heretofore. The question then resolves itself into one of whether the Board of Supervisors did abuse its discretion or act in an arbitrary manner. The Legislative authority in this area is plenary. It is not the function of this court to superimpose its concepts of prudence upon a legislative body. It seems clear that in the absence of noncompliance with the substantial provisions of the law or allegations of fraud, the courts may not interfere with the decision of the Board of Supervisors regarding the annexation. (*Hughes* v. *Ewing*, 93 Cal. 414 [28 P. 1067]; *Pass School District* v. *Hollywood etc. District*, 156 Cal. 416 [105 P. 122, 20 Ann.Cas. 87, 26 L.R.A. N.S. 485]; *People* v. *City of Los Angeles*, 154 Cal. 220 [97 P. 311]; *Antelope Valley Union High School District* v. *McClellan*, 55 Cal.App. 244 [203 P. 147].)

The appellant relies heavily upon two particular cases in an attempt to show that the Board abused its discretion. The first is *Heaton* v. *Jackson*, 34 Ohio App. 424

[171 N.E. 364], and the second is *Myers* v. *Board of Supervisors,* 156 Miss. 251 [125 So. 718]. While there are in those cases certain factual similarities with the case at bar, there are also manifest dissimilarities. In the Heaton case, there was fraud, collusion, and gerrymandering. In the Myers case, there was gerrymandering. There are no such allegations made in the case at bar. On the contrary, the record discloses that the Muscio petition was filed requesting annexation and presented to the Board of Supervisors on July 9, 1958; that the Board set July 21, 1958, as the date for a public hearing; that large numbers of affidavits from residents, electors or property owners were received by the Board *prior* to the public hearing held on July 21, 1958; that arguments were given pro and con; that counsel represented some of the citizens and taxpayers; that the Board had before it the County Committee on School Organization's recommendations with recommended annexation.[4]

Appellant urges too that "The change of boundaries violated Article IX, Section 5, of the California Constitution."

---

[4]The April 14, 1958, Santa Barbara County Committee on School District Organization "Summary Report and Recommendation re: Casmalia School District Study" provides in part as follows:

". . . . . . . . . . . .

"VI. County Committee Recommendations:

"Upon request of the Committee members present the Chairman was asked to present the alternative recommendations for Committee vote.

". . . . . . . . . . . .

"Alternatives considered included:

"1. The construction of a new school on the present or expanded Casmalia School District site.

"2. The annexation to an adjacent school district. In this instance, the Orcutt Union School District.

"3. Contract to educate Casmalia pupils, by interdistrict agreement, in an adjacent school district retaining local district identity and administrative functions.

"On the basis of the detailed basic data reports, and the extended discussions held at the required meetings, Committee members present indicated the following factors to be of major importance in this particular study:

"1. Multi-graded schools are generally not conceded to be as adequate nor as socially desirable from the standpoint of pupil growth and development.

"2. Experience has indicated that schools under 300 a.d.a. are substantially more expensive to operate on a per unit basis.

"3. There is a question as to the ability of the Casmalia District to continue to finance an adequate program without materially increasing its school tax levy, both for operation as well as for capital outlay.

"4. In the event of extraordinary growth materializing in the immediate Casmalia townsite from the reactivation of Cooke Air Force Base, it is the opinion of the Committee that increased population could be served better and more economically with a larger administrative unit and a greater tax base.

Article IX, section 5 of the Constitution provides:

"Sec. 5. The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established."

■ As stated in *Hall* v. *City of Taft, supra,* 47 Cal.2d 177 [302 P.2d 574] at page 179:

"The public schools of this state are a matter of statewide rather than local or municipal concern; their establishment, regulation and operation are covered by the Constitution and the state Legislature is given comprehensive powers in relation thereto."

■ The Legislature has provided for changes of boundaries, it was contemplated by the Legislature that changes could and would be made. It appears obvious that a withdrawal of territory from a school district would have some effect on the assessed valuation of that school district. The Legislature must have contemplated this fact when it enacted provisions for changing boundaries.

In the trial court's "Memorandum of Opinion" filed January 27, 1959, it is stated in part:

"The serious question might well arise; if by impoverishing the Casmalia School District, Respondent deprived the children of an education. If this is the inevitable result of the boundary change, Respondent's action would be Unconstitutional and of no effect. *Before Respondent's actions relative to the change of District lines could be held Unconstitutional, Petitioner (appellant) would have to show that the courses of action remaining to Petitioner to educate the children of Petitioner District are of no avail.* The 'avenues of escape' left to Casmalia are set forth in Respondent's Points and Authorities and need not be repeated here. (i.e., see statements of facts, *supra.*) *There is no showing that one or more of them would be so impractical as to render Respondent's actions Unconstitutional.* (Emphasis added.)

"It must be remembered that if the legal effect of what

─────────────────────

"5. The relatively short additional distances required to extend existing bus routes to include Casmalia pupils are not considered to be a major factor insofar as expense is concerned.

"On the basis of the foregoing conclusions, it was moved . . . and seconded . . . *that the Santa Barbara County Committee on School District Organization recommend that the Casmalia School District Trustees request annexation to the Orcutt Union School District.*" (Emphasis added.)

The above was carried by a vote of seven (7) to one (1).

has taken place is unfortunate, unwise, and has created undue hardship, the remedy is with the governing Boards involved and not with the Courts. It is apparent that some action must be taken, but an appeal to the Courts is not the proper one.''

Appellant assumes insolvency when there is no evidence in the record showing that Casmalia School District has in fact been rendered insolvent. There is no evidence that Casmalia School District's liabilities exceed its assets, nor that it will be unable to meet its obligations as they fall due. While it is possible that at some future time it will develop that Casmalia School District is insolvent, it must be remembered that this action is in mandamus and that a clear and specific right must exist in order to obtain relief.

Appellant's next contention is that ''The boundary change is contrary to the Due Process and Equal Protection Clauses of the State and Federal Constitution.'' This argument is directed to the proposition that the imposition of an unreasonable tax burden on the taxpayers of Casmalia School District amounts to the taking of property without just compensation and without due process of law. Again appellant assumes a fact not in evidence, to wit: that an unreasonable tax burden has been or is intended to be imposed.

Appellant also contends that it was denied due process in not being represented by the District Attorney of Santa Barbara County, at the change of boundary hearing on the Muscio petition before the Board of Supervisors. Appellant cites as authority *Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].

Among the exhibits before the trial judge and this Court is a letter dated August 20, 1958, from the office of the District Attorney of Santa Barbara County to the Board of Trustees of Casmalia School District. This letter indicates that the law firm which represents substantially all of the bond buyers who bid on Santa Barbara County School District bond issues required a test suit before they would recommend the bond issue. The letter provides in part:

''If you desire to initiate such a suit, it would be necessary for the school district to retain a private attorney to represent the district in an action against the Board of Supervisors. Under the ruling of the Attorney General's office, the District Attorney may represent a school district only where the County's interest is not adverse to that of the school district.''

As provided in section 26526 of the Government Code: ''The district attorney is the legal adviser of the board of

supervisors. He shall attend its meetings, when required, and shall attend and oppose all claims and accounts against the county he deems unjust and illegal.''

Section 26527 of said Code provides: ''The district attorney except for his own services shall not present any claim, account, or demand for allowance against the county nor in any way advocate the relief asked on any claim or demand made by another.''

From the above, it is apparent that the district attorney was not under a duty to represent the school district against the Board of Supervisors. An examination of the record discloses that Mr. Reid, attorney for appellant, appeared before the board of supervisors representing the citizens of Casmalia.

''MR. McCARTHY: We will stipulate that Mr. Reid appeared before the Board of Supervisors representing some of the same people, in their private capacities, but not in their capacity as trustees of the Casmalia School District.

''Is that your point, Mr. Reid? You represented them as individuals?

''MR. REID: My point is, I never represented the Board of Trustees of the Casmalia School District in their official capacity, which is stating in another way what you stated.''

Appellant's last contention is that ''The Board of Supervisors is required to sell the bonds of Casmalia School District although the change of boundaries of the district is held valid.'' As indicated in 43 California Jurisprudence 2d 660:

''In *appropriate cases,* mandamus lies to compel issuance of school district bonds.'' (Emphasis added.) (*Calistoga Joint Union High School District* v. *Webber,* 54 Cal.App. 38 [200 P. 1061]; *Napa Union High School District* v. *Napa County,* 54 Cal.App. 326 [201 P. 948]; *Sonoma County* v. *Sanborn,* 1 Cal.App.2d 26 [36 P.2d 419]; *Sacramento County* v. *Stephens,* 11 Cal.App.2d 110 [53 P.2d 197].)

On March 12, 1958, the Board of Trustees of Casmalia School District adopted a resolution calling a school bond election for May 20, 1958, said bonds to be in the amount of $80,000. On May 9, 1958, the Muscio petition was presented to the Board of Supervisors. On May 20, 1958, the school district held its bond election and on May 28, 1958 the Board of Trustees of the school district requested the board of supervisors to sell the bonds voted upon in the election. It was stipulated by the parties that the bond proceedings were prop-

erly conducted and held and properly certified as required by law. The Muscio petition was presented to the board of supervisors prior to the bond election.

Section 7431 of the Education Code (i.e., now § 21801) provides: "Section 7431: *Maximum total of bonds issued. The total amount of bonds issued shall not exceed 5 per cent of the taxable property of the district* as shown by the last equalized assessment of the county or counties in which the district is located." (Emphasis added.)

Therefore, whether or not the board of supervisors can be compelled to sell the school bonds is dependent upon the determination of the effective date of annexation. ▮▮▮ Mandamus will not be granted in cases where, if issued, it would prove unavailable. (*San Diego & Arizona Ry. Co.* v. *California State Board of Equalization,* 164 Cal. 41 [127 P. 153] ; *Ayers* v. *Kingsbury,* 25 Cal.App. 183, 191 [143 P. 85].)

▮▮▮ Contrary to appellant's contention, the effective date of the Board's action is controlled by section 1593 (i.e., now § 1603) of the Education Code and not by section 1591 (i.e., now § 1601), thereof. Section 1593 states in pertinent part: ". . . the action shall be effective as to any district . . . on the date the action is completed. . . ."

The annexation was completed July 29, 1958, when the Board of Supervisors passed the resolution approving the annexation.

The trial court was correct in refusing to issue the writ of mandate since there no longer remained sufficient valuation to sustain an $80,000 bond issue. (Ed. Code, § 7431.)

For the reasons stated the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.