[S. F. No. 14569. In Bank.—September 16, 1932.]

STATE COMPENSATION INSURANCE FUND, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and AUGUSTE MARC, Respondents.

Daniel W. Burbank and C. F. Laumeister for Petitioner.

John Francis Neylan, Grove J. Fink and John B. Connolly, as *Amici Curiae* on Behalf of Petitioner.

A. I. Townsend for Respondents.

CURTIS, J.—Proceeding in review to annul an award of the Industrial Accident Commission in favor of the Globe Indemnity Company and against the State Compensation Insurance Fund. The State Compensation Insurance Fund was the insurance carrier of the Examiner Printing Company, the publisher of the "San Francisco Examiner." On January 1, 1931, a paper carrier named Marc was injured while delivering "Examiners" on his regular newspaper route, which route is known as route 45. This route was being operated by T. O. Throndson under a lease thereof from Mrs. Abbie Paulsen. Mrs. Paulsen secured the route from her husband, Peter Paulsen, who in turn had secured it, on September 1, 1903, from Ed Delsani. In just what

manner the latter became the owner of said route, the record does not indicate. This fact is not material as all of the parties hereto agree that the route was owned and operated as stated above. The injured employee, Marc, was at the time of his injury employed by Throndson, whose insurance carrier was the Globe Indemnity Company. The Examiner Printing Company was a party to all of the above transfers, that is, it gave its written consent to said transfers. It was not a party to the lease from Mrs. Paulsen. It, however, was fully informed as to the nature of said lease, its circulating manager having witnessed the execution of the same, and thereafter recognized Throndson and dealt with him as the lessee of said route, and the person entitled to conduct and operate the same from April 30, 1928, the date of said lease, until the injury to Marc, which occurred on January 1, 1931. At the time of said injury, Throndson carried compensation insurance with the Globe Indemnity Company, which company settled in full with Marc for all compensation and other charges due him by reason of his said injury. An application was filed before the Industrial Accident Commission by the Globe Indemnity Company and Throndson against the Examiner Printing Company, and its insurance carrier, the State Compensation Insurance Fund, to determine the person or company legally liable for the payment of said compensation and charges. As already stated, Marc has been paid in full. Throndson and the Examiner Printing Company were each insured. This controversy, therefore, is solely between the Globe Indemnity Company on the one hand and the State Compensation Insurance Fund on the other.

There is no substantial conflict in the evidence. Therefore, the only question for our determination is whether the evidence before the Commission was, as a matter of law, sufficient to justify the findings of the Commission, and its award based upon said findings. The Commission found that at the time Marc received his said injuries he was in the employ of the Examiner Printing Company and at that time the State Compensation Insurance Fund was the insurance carrier of the Examiner Printing Company. The award of the Commission accordingly ran in favor of the Globe Indemnity Company and against the State Compensation Insurance Fund.

■ It is the contention of petitioner, the State Compensation Insurance Fund, that at the time Marc was injured he was in the employ of Throndson, and not in the employ of the Examiner Printing Company, while the respondents contend that he was not in Throndson's but in the Examiner's employ. In determining this question it will be necessary for us to ascertain the legal relation existing between the Examiner Printing Company and Throndson, as well as the relation between Throndson and Marc at the time the latter was injured.

Throndson's regular business was the insurance business. He, however, conducted two newspaper routes for the Examiner Printing Company. These routes were known as route 31 and route 45. Route 45, he operated under the lease from Mrs. Paulsen. He paid Mrs. Paulsen $20 per month as rental under the lease and was entitled to all the profits of the business. He bought his papers outright from the Examiner Printing Company, paying the company at the rate of $1.60 per hundred for the daily issues and 6 cents each for the Sunday issues. Under the assignment whereby Mrs. Paulsen acquired route 45, to which assignment the Examiner Printing Company was a party and gave its consent in writing, Mrs. Paulsen agreed to canvass the route regularly, and upon her failure to do so the Examiner Printing Company was given the right to put canvassers on the route and to make deliveries required in the course of the business at the expense of Mrs. Paulsen. She also agreed to comply with all the rules and regulations of the Examiner Printing Company, regulating the conduct of its business and that of the carriers of its papers and also to pay for all papers weekly at the then rate, or at such rate as might be established from time to time. The term of the lease from Mrs. Paulsen to Throndson was five years with a proviso that either party might terminate the same after one year by giving sixty days' notice to the other. The lease further provided that if it should appear to Mrs. Paulsen or the Examiner Printing Company that Throndson was guilty of any breach of the terms thereof, Mrs. Paulsen might, at her option, terminate the lease; also that at the expiration of the lease Throndson would furnish to Mrs. Paulsen and to the Examiner Printing Company the addresses of all subscribers on the route, and that he would

render assistance to his immediate successor by "breaking in" said successor and by giving him full and complete information without remuneration or compensation on all particulars relating to the route. As stated above, the Examiner Printing Company was not a party to the lease from Mrs. Paulsen to Throndson. The terms of the lease, therefore, had no bearing upon the relationship existing between Throndson and the Examiner Printing Company. Throndson, however, was bound by the terms of the assignment of the lease to Mrs. Paulsen, to which the Examiner Printing Company was a party. As lessee of Mrs. Paulsen he stood in her place, and sustained the same relationship to the Examiner Printing Company as Mrs. Paulsen sustained prior to the execution of the lease. Throndson hired Marc and paid him $60 per month for the latter's services. Marc's duties were to get the papers at the office of the publisher and deliver them to subscribers throughout the territory within the route. He conveyed the papers from the office to his route on the street-car. He paid his own street-car fare and other expenses incident to the delivery of the papers. The Examiner Printing Company never paid him anything for his services in delivering the papers, or otherwise. He attended to all complaints, and had a box or pigeonhole in the office of the Examiner, where he would receive complaints and get the names of new subscribers. Throndson left the delivery of the papers entirely to Marc. He, however, attended to the collection of subscriptions from the subscribers, and paid the Examiner Company for the papers purchased.

It is clear from the foregoing facts that Marc, at least primarily, was the employee of Throndson. He was hired by Throndson, paid by him, and his actions were under the complete and direct control of Throndson. However, if Throndson was an employee of the Examiner Printing Company, with authority to hire Marc, then while primarily Marc was in the employ of Throndson, in the final analysis of the situation, he was an employee of the Examiner Printing Company. It is apparent, therefore, that the vital question in issue in this proceeding depends upon the relation existing between Throndson and the Examiner Printing Company.

As we have seen from the facts stated above, the Examiner Printing Company did not pay Throndson any wages or compensation of any kind or nature. It sold outright to Throndson the papers which he circulated to the subscribers throughout his route. Throndson was not on the payroll of the Examiner Company. His profits came from the sale of the papers which he had bought of the Examiner Company, after deducting the cost to him of the papers and the expense of delivering them to the subscribers. Section 8a of the Workmen's Compensation, Safety and Insurance Act (Stats. 1917, p. 831) defines an employee as "every person in the service of an employer . . . under any appointment or contract of hire or apprenticeship, expressed or implied, oral or written". We think it would be an unwarranted extension of this definition of an employee to hold that one who is not hired but who simply purchases papers or other commodities of another for the purpose of reselling them comes within the terms thereof. In the recent case of *New York Indemnity Co.* v. *Industrial Acc. Com.*, 213 Cal. 43 [1 Pac. (2d) 12], we held that a "newsboy" who purchased papers from the publisher to sell them upon the streets was not an employee of the publisher, even though the publisher allotted to the newsboy a certain corner of the city where the latter would conduct his business of selling papers. We can see but little if any difference in principle between the relation existing between the newsboy and the publisher in that case and between Throndson and the Examiner Company here. Respondents rely, as did the Commission in that case, upon the case of *Globe Indemnity Co.* v. *Industrial Acc. Com.*, 208 Cal. 715 [284 Pac. 661], but we pointed out the distinction between those two cases in our opinion in the case of *New York Indemnity Co.* v. *Industrial Acc. Com.*, *supra*. That same distinction exists between the Globe Indemnity Company case and the instant action. We there said in the more recent of those two cases: "Nor do we think that there is a sufficient analogy between the facts involved in this proceeding and those existing in the case of *Globe Indemnity Co.* v. *Industrial Acc. Com.*, *supra*, to justify its application to the case at bar, since in that case the evidence showed that an express relation of agency for the distribution of the daily issues of the Oakland Tribune to its subscribers in San Rafael ex-

isted between the applicant for an award and the publishers of said newspaper, in pursuance of which the applicant not only received a percentage of the monthly price which the subscribers paid, but was also paid a regular sum in addition thereto to cover the cost of distribution in outlying territory."

We there held (*New York Indemnity Co.* v. *Industrial Acc. Com.*) that the newsboy was a sales agent as that term was employed in the authorities cited in that opinion. We further held that while the publisher retained the right to sell papers to the newsboy only upon the latter complying with certain regulations adopted by the publisher respecting the conduct of the newsboy in making individual sales of papers to the public, the control thus reserved by the publisher was not as a matter of law sufficient to constitute the newsboy an employee of the publisher. The regulations under which the newsboys operated, as shown by the evidence in that case, consisted of the following: "That certain specified corners or places upon the public streets were allotted, when unoccupied, to particular newsboys applying for the same, who received instructions from the district manager not to intrude upon or interfere with the corner or place allotted to another. Each particular newsboy was expected and in fact required to be active and vigilant in making sales of a prescribed minimum number of each of said newspapers at or near his designated place; in short to be a 'hustler' in making sales. Otherwise, his allotted place or corner would be given to another newsboy and he would be refused further copies by the district manager." The control exercised by the Examiner Printing Company over those in charge of its delivery routes, including Throndson, may be briefly stated to include prompt and regular distribution of the paper to the subscribers residing in the respective routes; a thorough canvass of the residents thereof as prospective subscribers of the paper; prompt adjustments of all complaints made by subscribers; and compliance by the carriers with all the rules and regulations of the publisher respecting the conduct of its business and that of its carriers. We think it apparent from this statement that the control exercised by the Examiner Printing Company over the owners of its routes, or their lessees, did not convert them into mere employees of the company.

The purpose of these regulations prescribed by the company was to insure a certain and definite result—the prompt and regular distribution of its publication to all persons in the several routes who might be secured as subscribers of said publication. The means by which this result was to be accomplished was left entirely to the route owner, or carrier, in each route. As long as he produced the result desired, the Examiner Printing Company did not interfere with the manner or means by which this result was accomplished. The carrier might personally make deliveries of the papers, or he might employ others to act for him. The carrier might use any manner of conveyance in his work, or he might make deliveries on foot. When we take into consideration the limited control which the Examiner Printing Company exercised over Throndson, with the further fact that the Examiner Printing Company paid Throndson no wages or salary but simply sold him papers which the latter was to resell, we are forced to the conclusion that the relation of employer and employee did not exist between the Examiner Printing Company and Throndson, but that, on the other hand, Throndson, either as a sales agent, or we think more properly, as an independent contractor, was performing the service of delivering papers in said route No. 45.

A case strikingly like the instant one is that of *Gall* v. *Detroit Journal Co.*, 191 Mich. 405 [19 A. L. R. 1164, 158 N. W. 36]. In that case a newspaper carrier injured the plaintiff while the former was delivering papers for the defendant. That case was much stronger than the case before us in that the carrier there was paid wages for his services but was left free to employ any means or method which he might choose in the performance of said services. In deciding that the defendant was not liable for the acts of the carrier in injuring the plaintiff, the court said: "Rebtoy [the carrier] was to deliver the papers to such persons, at such places, and on such time as the company should from day to day designate. Such delivery was the result to be obtained. And Rebtoy was to effect such delivery and obtain such result by any means and by any conveyance and in any way he saw fit. He could make the deliveries in person, or through others employed by him. It was shown in evidence that those making deliveries for

the company did occasionally employ others to do the work. He could use a horse, an automobile, or carry the papers on foot, provided he got them to the right persons at the right places, and upon time. So far as the terms of the contract are concerned Rebtoy was certainly an independent contractor and not a servant. One whom the employer does not control, and has no right to control, as to the method, or means, by which he produces the result contracted for is an independent contractor.'' (Citing authorities.)

We have not overlooked the provision in the assignment to Mrs. Paulsen, whereby she agreed to comply with all the rules and regulations of the Examiner Printing Company, made to regulate the conduct of its business and that of the carriers and owners of its newspaper routes. This obligation was binding upon Threndson, the lessee of Mrs. Paulsen. In so far as these rules and regulations might apply to the owners of the newspaper routes, they were limited to the conduct of such route owners. They did not purport to deal with the means or methods employed by the route owners in making delivery of papers throughout their respective routes. In the ''newsboy'' case referred to above, it was shown that the district manager of the paper ''supervised the daily conduct'' of the newsboys in the selling of their papers, but we held that such control did not make them employees of the publisher.

Respondents rely with some assurance upon the cases of *Globe Indemnity Co.* v. *Industrial Acc. Com.*, 208 Cal. 715 [284 Pac. 661], *Call Publishing Co.* v. *Industrial Acc. Com.*, 89 Cal. App. 194 [264 Pac. 300], and *Carlson* v. *Industrial Acc. Com.*, 213 Cal. 287 [2 Pac. (2d) 151]. We have already shown how the facts in the Globe Indemnity Company case differ from those in the instant case and further reference to that authority is unnecessary. The facts in the Call Publishing Company case are more like those in the Globe Indemnity Company case than in the case before us. In the Call Publishing Company case, the injured employee, who was in the employ of that company, was paid, in addition to the receipts from the route covered by him, a regular weekly wage or salary of $32.50 per week for his services in delivering the papers on said route. His was a contract of hire. He held no definite agreement from his employer but could be dismissed at any time.

It is apparent that this case has no controlling effect upon the instant case.

In the case of *Carlson* v. *Industrial Acc. Com., supra,* the court was asked to annul an award in favor of the dependents of a man named Rodgers, who was fatally injured while performing services upon the ranch owned by the plaintiff. The plaintiff, Mrs. Carlson, was the owner of the ranch, and had executed an instrument whereby she purported to lease the ranch to Rodgers. By the terms of this instrument Rodgers was to receive a share of the crops produced on the ranch as compensation for his services rendered in operating the ranch. Among other things, this instrument, termed a lease, provided: "That all work of every description shall be done under the supervision of the party of the first part [Mrs. Carlson], her agent, or representative, and in strict accordance with her wishes, ideas and instructions, and the different lines of work must be carried out in their proper time and season, as directed by the party of the first part." It was held by reason of this provision of the lease, as well as others of less potency, that Mrs. Carlson reserved control over the manner in which the ranch was to be farmed by Rodgers; that is, while Rodgers had agreed to work the ranch, Mrs. Carlson had reserved control of the means and method by which this work was to be performed. The evidence, therefore, was held to be sufficient to support the finding of the Commission that Rodgers was an employee of Mrs. Carlson at the time of his injury and not her tenant. It will be noted that in the instrument whereby Mrs. Carlson sought to lease the ranch to Rodgers she explicitly reserved control of the manner and means of doing all work performed by Rodgers. No such reservation of control exists in the instant case. On the other hand, as we have seen, Throndson had exclusive control of the means by which his work was to be done, and was responsible to the Examiner Printing Company only for the result to be accomplished. We find nothing in the Carlson case helpful to respondents.

Another case which has been referred to in the briefs of the parties hereto is the case of *Boehm* v. *Spreckels,* 183 Cal. 239 [191 Pac. 5, 8]. That case involved a controversy between the owner of a newspaper route and the publisher of the paper. It was there held that a contract

whereby a publisher transferred and delivered to a carrier a certain route for the delivery of newspapers "created an agency and did not declare a sale of property". The plaintiff in that action contended that by the purchase of a route by the carrier he acquired an interest in the business of the publisher of the newspaper. The decision holds that no interest in the business was involved in such transaction. It is true the decision states that an agency was thereby created rather than that a sale was declared. However, the court was not in that action concerned with any question involved in the instant case, and we do not consider the decision therein determinative of any of the issues of this action. The term "agency" is a broad one and may include every relation in which one person acts for another. It is frequently used in connection with an arrangement which does not in law amount to an agency, as where the essence of an arrangement is bailment or sale, as in the case of a sale agency exclusive in certain territory. (*Piper* v. *Oakland Motor Co.,* 94 Vt. 211 [109 Atl. 911, 912].)

■ From the foregoing we conclude that there is no evidence in the record to support the finding of the Commission that Marc was at the time of his injury in the employ of the Examiner Printing Company. The award, therefore, based upon said finding should be, and it is hereby, annulled.

Langdon, J., Preston, J., Tyler, J., *pro tem.,* Shenk, J., and Waste, C. J., concurred.