[Civ. No. 1967. Fourth Appellate District.—June 17, 1937.]

CHARLES W. BATT et al., Respondents, v. SAN DIEGO SUN PUBLISHING COMPANY, LTD. (a Corporation), Appellant.

Frank J. Macomber for Appellant.

Edward J. Kelly and Ben R. Rubin for Respondents.

MARKS, J.—Plaintiffs are the sole heirs at law of their minor son, Edgar Irwin Batt, who was killed in a collision with an automobile driven by a minor, Boyd S. Cottrell, with the consent of his parents, Hilda S. and Fred Cottrell. The San Diego Sun Publishing Company was joined as defendant on the theory that Boyd S. Cottrell was its employee engaged in the business of the employer at the time of the fatal accident. Plaintiffs recovered judgment against all the defendants, and the San Diego Sun Publishing Company, Ltd., has appealed from the judgment and from the order denying its motion for judgment notwithstanding the verdict.

At the time of the accident young Cottrell was a route carrier for appellant and delivered its papers to subscribers. He purchased his papers at the rate of forty-seven cents a month for each subscriber, collected sixty-five cents from each subscriber each month, leaving him eighteen cents·from each subscriber as compensation for his work.

The sole question necessary for us to consider on this appeal is whether Cottrell was an employee of appellant, or an independent contractor, in serving the subscribers on his route. At the time of the accident he was collecting from subscribers. When the accident happened he had exhausted his change and was driving to a store to procure change so he could continue his collections.

Young Cottrell gained his right to deliver papers to subscribers under the following written contract:

"Name Boyd Cottrell. Phone .... Route 554E

Date of Birth   March 14, 1918.   Age 16.

Address 5148 69th.   City or Town San Diego

"CARRIERS' AGREEMENT

"In CONSIDERATION of being appointed a carrier for the San Diego Sun of San Diego, Calif., and given the privilege of buying newspapers from the said newspaper, I agree to abide by the following rules and conditions:

"1.—To pay my paper bill in full on or before the seventh day of each month for all papers furnished to me during the preceding month at the whole-sale rate for route carriers.

"2.—To deposit a cash bond amounting to $20.00 as a guarantee for the faithful performance of this agreement. (This deposit is to be held by the San Diego Sun during the life of this agreement and refunded to the carrier upon cancellation, less any monies he may still owe the San Diego Sun for papers, customers collected from in advance or otherwise. This deposit will bear interest at the rate of four per cent per annum, providing the carrier remains on the route for six months or more. This paragraph is not a receipt but upon making cash bond deposits the carrier will get a receipt, which should be attached to this agreement for his record.)   Bond to be paid at the rate of $1.00 per month.

"3.—To collect promptly from the subscribers on my route at the rate of 65c a month or single copies 3c.

"4.—To give good delivery service; first, by being at the corner or station designated by the San Diego Sun at the appointed time each and every afternoon, except Sundays; second, to promptly fold my papers; third, to then deliver my route as quickly as possible; fourth, to leave each subscriber's paper on the porch by the front door, or in any place designated by various subscribers of the San Diego Sun.

"5.—It is understood that failure to give good delivery service may mean my immediate dismissal; further that a fine will be imposed for any or all complaints that are served by special messenger or otherwise from the San Diego Sun.

"6.—To keep a substitute thoroughly familiar with my route to take my place in case of illness or otherwise. (In case of illness or otherwise notify your district manager or the office at once.)

"7.—To do all in my power to build up and extend the circulation of the San Diego Sun and not to work in any capacity for any other San Diego newspaper or publication.

"8.—To keep a complete, correct and up-to-date record of all subscribers on my route at all times, which consists of a loose-leaf record furnished by the San Diego Sun. A fine of $1.00 will be imposed for losing loose-leaf records of the route. All route records are the property of the San Diego Sun and are to be returned to the office whenever requested. It is further understood that the route is the property of the San Diego Sun and under no consideration can it be sold.

"9.—To keep my order for papers correct at all times. (Papers are only added to your bundle for loose-leaves of new subscribers sent to you; papers are only deducted when loose-leaves are turned on account of subscribers stopping the paper.)

"10.—To give the San Diego Sun at least two weeks' notice in writing when I intend to terminate this agreement and to teach my successor for at least three days the deliveries of said paper route.

"11.—It is clearly understood that I am not an employee of the San Diego Sun in any sense. I am to buy from the company and pay for all papers delivered to me.

"12.—It is further agreed that the rate charged for the paper may be changed at the option of the San Diego Sun upon due notice thereof, and that this agreement may be cancelled at any time at the discretion of the San Diego Sun.

"This agreement to become effective Aug. 1st, 1934.

"Boyd Cottrell<br>("Carrier's Signature)

"PARENTS' CONSENT AND GUARANTEE

"We hereby agree to our son signing the above agreement and will be responsible for any paper bills due from him to the San Diego Sun: We will also assist him in every possible way to comply with the rules printed above.

"Wilifred H. Cottrell<br>"Hilda S. Cottrell

"" (Signature of both parents required)

"Accepted by
The San Diego Sun
Per Earl Coventry."

The instant case was tried before the rendition of the decision in the case of *Bohanon* v. *James McClatchy Pub.*

*Co.*, 16 Cal. App. (2d) 188 [60 Pac. (2d) 510]. The arguments made by the respondent in that case to support the conclusion that the contract of James McClatchy Publishing Company was a contract of employment and not of independent contract, correspond to the arguments of respondents here in support of the implied finding of the jury that the contract between appellant and young Cottrell disclosed the relation of employer and employee and not of independent contract. The contracts in the two cases are so similar in legal effect, and the arguments of each set of respondents are so carefully and fully considered in *Bohanon* v. *James McClatchy Pub. Co.*, *supra*, that it would be a needless repetition to again review them here. We will confine ourselves to a consideration of the arguments of respondents here in attempting to distinguish the two cases.

Respondents first urge that the Bohanon case is based solely on an interpretation of a written contract; that in the instant case the respondents were not parties to any written contract and therefore are not bound by its terms; that there was a parol contract between appellant and young Cottrell which was independent of the writing and was a strict contract of employment.

The first argument can have no merit unless the second be sound. If the written contract established the relationship between appellant and Cottrell, respondents' rights of recovery against appellant are fixed by that relationship. While they may attack the contract in any legal way they choose, they cannot escape the legal effect of the contract, assuming there was no other. To that extent they are bound by it, for if that contract established the relationship of employer and employee they can support their judgment against appellant; otherwise they cannot. ■ They maintain that there was a separate parol contract of employment between appellant and Cottrell which permitted him to solicit and secure new subscribers at a compensation of eighteen cents a subscriber, in addition to the compensation fixed in the contract. We will assume, without holding, that such a parol contract was made and that under its terms Cottrell was the employee of appellant when soliciting new subscribers. However, he was not soliciting new subscribers at the time of the accident. He was collecting from regular subscribers which was a duty imposed upon him by the written contract.

As he was not acting under the parol contract of employment, that agreement can have no bearing on the instant case. Thus we are confined to the written contract under which he was acting at the time of the accident to determine his relationship with appellant at that time. (See *State Compensation Ins. Fund* v. *Industrial Acc. Com.*, 2 Cal. (2d) 94 [39 Pac. (2d) 201].)

■ Respondents next contend that the contract in the Bohanon case was one of lease by the James McClatchy Publishing Company, while in the instant case it is one of employment. This court did not so construe the James McClatchy Publishing Company contract. In speaking on that question this court, through Mr. Justice Jennings, said:

"Primarily, the contract is one of purchase and sale whereby appellant agrees to sell and Engebrecht agrees to purchase an indefinite number of appellant's newspapers at a specified price per hundred. It is a matter of common knowledge, of which we are entitled to take judicial notice, that newspapers which are delivered by carrier to the residences of subscribers are paid for by the month. We are also entitled to indulge in the assumption that publishers of newspapers, like other persons who are engaged in the business of producing merchandise for sale and of selling such merchandise, are primarily interested in deriving a profit from the enterprise. It is therefore obvious that the final result which was expected to be achieved from the work of distribution which Engebrecht was to perform was the sale to him by appellant of the largest possible number of its newspapers."

It is true that in the James McClatchy Publishing Company contract the wholesale price of the daily paper to be sold was fixed at $1.90 per one hundred, while in the instant case it was fixed at 47 cents per month for each subscriber. This only shows a difference in arriving at the cost to the distributor of each paper delivered. Both contracts fixed the prices to be collected from the subscribers and left the distributors' compensations at the difference between the wholesale cost of the papers and the total sums collected from subscribers. In each case the distributor, and not the publisher, suffered from any losses on collections from subscribers. We cannot distinguish between either of these contracts and the contract between a retailer and wholesaler

where the retailer agrees to pay a fixed price for his merchandise and hopes to sell at a profit.

What we have just said also covers the next distinction which respondents seek to draw between the two contracts; namely, that in the Bohanon case the contract created a "buy and sell" relationship, while in the instant case the relationship of employer and employee was created.

On the back of the receipts furnished by appellant to Cottrell, to be signed by him and delivered to a subscriber upon payment of a subscription was printed an advertisement of "The Sun's Dime-A-Month Insurance" in which appeared the statement that "Your carrier boy will gladly take your application." It is urged that this gave Cottrell, as an employee of appellant, the right to solicit insurance outside the terms of his written contract. Assuming, without holding, that this argument of respondents is sound, there is no evidence that Cottrell ever acted under this implied authority or ever solicited insurance. Certainly, he could not be said to have been acting under it, or to have been soliciting insurance, when he was on his way to secure change so that he might continue his collections from his regular subscribers.

█ Respondents point to the last phrase of the contract, "and that this agreement may be cancelled at any time at the discretion of the San Diego Sun", and urge that this phrase gave appellant complete control over the methods to be employed by Cottrell in performing under his contract, which is only consistent with the relation of master and servant and not that of independent contractor. It is true that the right of immediate discharge usually has been held to indicate the existence of the relation of master and servant. But this has not always been true. (See *Royal Indemnity Co.* v. *Industrial Acc. Com.*, 104 Cal. App. 290 [285 Pac. 912] ; *Peters* v. *California Building-Loan Assn.*, 116 Cal. App. 143 [2 Pac. (2d) 439] ; *Hartford A. & I. Co.* v. *Industrial Acc. Com.*, 123 Cal. App. 151 [10 Pac. (2d) 1035].)

It is well settled that a contract must be construed as a whole and that all of its provisions must be considered in giving effect to any one of them. The phrase above quoted must be construed with all the rest of the contract and particularly with the opening clause of paragraph numbered "5" wherein it is said, "It is understood that failure to give

good delivery service may mean my immediate dismissal''. We have concluded that the fair interpretation of the entire contract reserved to appellant the right to immediately dismiss Cottrell in case his delivery service was inefficient. With this interpretation placed upon it the contract in question here is identical in legal effect with that in the Bohanon case of which we said: (16 Cal. App. (2d) at pp. 203, 204.)

''The provision whereby appellant reserved to itself the right to discharge Engebrecht is one upon which respondent places particular reliance as evidence bearing directly on the important feature of right of control. It must be conceded that generally an express reservation of the right of discharge is indicative of that right of control which is a recognized test by which to measure a relationship between individuals for the purpose of determining whether or not such relationship is that of master and servant. The importance of the right of discharge as a significant circumstance in arriving at a proper determination of the true character of the relationship is emphasized in the following decisions: *Western Metal Supply Co.* v. *Pillsbury,* 172 Cal. 407, 417 [156 Pac. 491, Ann. Cas. 1917E, 390]; *Press Pub. Co.* v. *Industrial Acc. Com.,* 190 Cal. 114, 119 [210 Pac. 820]; *May* v. *Farrell,* 94 Cal. App. 703, 711 [271 Pac. 789]; *Chapman* v. *Edwards,* 133 Cal. App. 72, 79 [24 Pac. (2d) 211]; *Hollingsworth* v. *Pemberton,* 138 Cal. App. 261, 264 [31 Pac. (2d) 1063].'

''However, in this connection, it must be borne in mind, as heretofore observed, that the control which is recognized as the test of the relationship means unqualified control, complete control, and that in the very nature of things, a person who is beneficially interested in work which another is performing for him is permitted to exercise some measure of control without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled.

''Having in mind the necessity that the control shall be a complete or unqualified control we may proceed to examine and analyze the provision of the agreement whereby appellant reserved to itself the right to discharge Engebrecht. The language is that appellant 'reserves the right to take over and assume charge and management of the route abovementioned at any time, in event that the management of the said route or the services performed by the said contractor shall fail to prove satisfactory to the company.' From the

above quoted language it is apparent that the right of discharge which appellant thereby reserved is modified by the qualification that it could be exercised only in the event that Engebrecht's services or his management of the route should prove unsatisfactory to appellant. While it is true that appellant thereby established itself as the sole arbiter of Engebrecht's performance of the work it is also apparent that the right of discharge is not a right of arbitrary discharge. Appellant would not be entitled, under the wording of the provision, to discharge Engebrecht capriciously. It could terminate the relationship only in the event that it should determine that Engebrecht's services or his management of the route should prove unsatisfactory. Quality of workmanship is usually reflected in the final result which is attained and one who is interested solely in the result may justifiably retain some interest in the character of work by which the result is finally consummated. The right of discharge is not conclusive evidence negativing independence of the person performing work for another. (*Peters* v. *California Building-Loan Assn.,* 116 Cal. App. 143, 153 [2 Pac. (2d) 439].)''

The case of *Rathbun* v. *Payne, ante,* p. 49 [68 Pac. (2d) 291], is also somewhat factually similar to the instant case. In that case the court remarked that either party to the carrier's contract was free to terminate it at will. The court there observed that ''the relationship must be determined from the whole situation'', and concluded that the relation of master and servant, or employer and employee, did not exist and that the provision for the right of immediate discharge was not controlling in determining the relationship of the contracting parties.

In the instant case the conclusion is unescapable that at the time of the accident in question here Cottrell was performing duties assumed by him under his written contract with appellant and no other. That being so, and that contract being free from ambiguity and clear in its terms, the interpretation to be put upon it and the relationship created by it between appellant and Cottrell, becomes one of law alone for decision by a court unhampered by the implied findings of a jury. We are of the opinion that the contract in the instant case cannot be distinguished in its legal effect from that before the court in *Bohanon* v. *James McClatchy Pub. Co., supra.* Both contracts created the relationship of independent contractor between the respective publishers and

carriers. As young Cottrell was not the agent, servant or employee of appellant, but an independent contractor, appellant is not liable for his tort.

The judgment against appellant and the order appealed from are reversed with instructions to grant appellant's motion for judgment notwithstanding the verdict and to enter judgment for appellant.

Barnard, P. J., and Jennings, J., concurred.