[Civ. No. 21229. First Dist., Div. Two. Aug. 18, 1964.]

ROY J. HOUSEWRIGHT, Plaintiff and Appellant, v. PACIFIC FAR EAST LINE, INC., Defendant and Respondent.

262

Jack H. Werchick and John F. Sullivan for Plaintiff and Appellant.

Boyd, Flageollet & Benson and Herbert Chamberlin for Defendant and Respondent.

TAYLOR, J.—Plaintiff, Roy J. Housewright, appeals from a judgment in favor of defendant, Pacific Far East Line, Inc., hereafter called Pacific, entered upon a verdict directed by the court in his action for damages for personal injuries.

Appellant was a maintenance mechanic employed by Ideal Cement Company, hereafter called Ideal. Pomeroy Construction Company had contracted with Ideal for the sale of 160,000 barrels of cement, and with Pacific for the transportation of the cement from Ideal's Redwood City plant to the construction site in Guam. Pacific, under its agreement, was to unload the cement from the vessels into the shoreside silos in Guam. After purchasing a new type of cement discharging equipment from Gordon Machinery Company, hereafter called Gordon, Pacific decided to test the equipment and obtained the cooperation of Ideal and Gordon. Preparations for the test were made at Ideal's Redwood City plant. Appellant was injured during these preparations. On November 7, 1956, he was knocked from a high platform by a load lifted to the platform with a crane operated by Roy Green, another Ideal employee assigned to the test. Appellant and Green were both working under the direction of Camblin, an employee of Gordon.

At the close of appellant's case, the trial court dismissed the complaint as to the other defendants and granted Pacific's motion for a directed verdict on the ground that in conducting the test, Ideal and Gordon were independent contractors rather than agents of Pacific. Appellant argues that it was error to direct the verdict for Pacific, as there was some evidence to support a judgment in his favor. He contends that the jury should have been allowed to determine the relationship of Pacific, Ideal and Gordon and the negligence of Camblin.

Viewing the record most favorable to the appellant, as we must on appeal from a judgment entered on a directed verdict or nonsuit (*Sanchez* v. *Rodriguez*, 226 Cal.App.2d 439, 442 [38 Cal.Rptr. 110]), the following facts appear: In the fall of 1956, the Pomeroy Construction Company, hereafter referred to as Pomeroy, a world-wide general contractor, received a contract from the Navy to build an airstrip on Guam. Subsequently, Pomeroy contracted with Ideal for the 160,000 barrels of cement required. Under this agreement, Ideal was to dredge its dock to accommodate seagoing vessels and load the cement directly into the ships.

Pomeroy also contracted with Pacific for the shipment of the cement at regular intervals from Redwood City to Guam. Pacific was also obligated to discharge the cement from its vessels into the shoreside silos in Guam. Since Pacific had not had experience with shipping bulk cement on regular cargo carriers, Pacific contracted with Gordon for the purchase of new airlift machinery to vertically discharge the cement from the hold of the cargo vessels to the shoreside storage facilities in Guam.

Although there was no contract between Ideal and Pacific, officials of both companies discussed the dock dredging operations. In the course of these discussions, Pacific's vice president Sorge talked to Ideal's former regional manager Lang. Because Lang had over 50 years of experience in the cement business, Sorge mentioned Pacific's plan to ship bulk cement in cargo vessels and discussed the airlift discharging equipment Pacific had purchased from Gordon for $75,000. Lang cautioned Sorge that the abrasive nature of the cement would affect the performance of the airlift equipment. Pomeroy also expressed doubts about the proper functioning of the equipment.

Thereafter, Sorge contacted Gordon and indicated that Pacific wanted to test the equipment before shipping it to Guam. A preliminary test at the Gordon plant in Marysville on October 19, 1956, was unsuccessful. Although not obligated to do any testing under its sales agreement with Pacific, Gordon orally agreed to find a more satisfactory test site in the Sacramento Valley. After this search proved unsuccessful, Sorge contacted Lang. Lang, as a matter of courtesy, offered the use of Ideal's facilities at Redwood City and indicated that Ideal would make available the necessary cement and supply whatever employees it could.

This understanding was oral and informal. Lang indicated that Ideal would not make a charge for the use of its facilities. Sorge told Gordon to contact Lang about some of the details of the test. Sorge, Pacific's engineer Novitski, and another Pacific official were present at this test which provided unsatisfactory results. Thereafter, a second test involving liquid coke was arranged.

When the liquid coke test resulted in a fiasco, Sorge had even greater doubt that the machinery purchased from Gordon for $75,000 would perform the task for which it was purchased. On October 31, three weeks before the first bulk cement shipment was due in Guam, Sorge attended a meeting at the Gordon plant in Marysville. Sorge indicated that before shipping the airlift equipment overseas, Pacific wanted another test.

Again, Gordon could not provide another test site and Sorge contacted Lang who renewed his earlier offer of cooperation from Ideal. By this time, although Pacific had other alternatives for unloading the cement, the matter was of some urgency as one ship was on the way to Guam and Pacific's contract with Pomeroy provided for the payment of demurrage if the cement was not delivered on schedule. Sorge put Novitski in charge of the arrangements for this third test, and indicated to several other Pacific officials that they were to be present at the test.

Novitski contacted both Gordon and Ideal. Gordon sent Camblin and Ross to Redwood City to supervise the test which was to simulate the height and rate of vertical discharge from a ship as closely as possible. Camblin was scheduled to supervise the airlift equipment in Guam for a $50 a day plus expenses to be paid by Pacific. He saw the surplus 10-foot by 15-foot platform on Ideal's premises and was given permission to use it in the test.

One of the two 90-horsepower motors Pacific had purchased from Gordon was to be used in the test. The motor and other parts of the airlift equipment were sent by Gordon to Ideal's Redwood City plant. Appellant, who had been employed by Ideal as a maintenance mechanic for many years, was assigned to the test site by his boss, Ideal's master machinist, to assist in the assembling of the airlift equipment under the direction of Camblin. At the time of the accident, appellant and Camblin were on the 22-foot high platform which was about 10 feet by 15 feet in area. Appellant was welding some parts of the equipment. Camblin was directing Green, another

Ideal employee, who had been assigned to the test site with a large crane.

The accident occurred in the early afternoon when Camblin told Green to pick up the fan or blower of the airlift machine and move it a few inches to the right. When Green pushed the lever, the crane began to run wild and swung around knocking appellant and Camblin off the platform. Both fell to a concrete slab and were injured. Appellant's injuries subsequently prevented him from resuming his permanent employment with Ideal.

## I RELATIONSHIP OF THE PARTIES

The first question is whether there is any substantial evidence or any reasonable inference from which it could be implied that Ideal and Gordon were the agents of Pacific in conducting the test. Respondent argues that the trial court properly concluded that they were independent contractors and that the evidence is reasonably susceptible to only one inference. We believe that reasonable minds may well differ as to the inferences to be drawn from the evidence here.

The question of whether an agency relationship has been created is a question of fact (*Thayer* v. *Pacific Elec. Ry. Co.*, 55 Cal.2d 430 [11 Cal.Rptr. 560, 360 P.2d 56]). An agency relationship may be informally created. No particular words are necessary to bring it into being. All that is required is conduct by each party manifesting acceptance of a relationship whereby one of them is to perform work for the other under the other's direction (*Malloy* v. *Fong*, 37 Cal.2d 356 [232 P.2d 241]). Whether or not the agency has been created is determined by the relations of the parties as they exist in fact under their agreement or activities (*Rezos* v. *Zahm & Nagel Co.*, 78 Cal.App. 728, 731 [246 P. 564]). Consideration is not essential (Lab. Code, § 2850; *McPhetridge* v. *Smith*, 101 Cal.App.. 122 [281 P. 419]). The right to control is the primary test of employment or agency (*Cox* v. *Kaufman*, 77 Cal.App.2d 449, 452 [175 P.2d 260]; *Nizuk* v. *Gorges*, 180 Cal.App.2d 699 [4 Cal.Rptr. 656]).

Likewise, the question whether one is an independent contractor, agent or employee is largely one of fact depending on all the circumstances of the relations of the parties (*Sparks* v. *L. D. Folsom Co.*, 217 Cal.App.2d 279, 286 [31 Cal.Rptr. 640]). An independent contractor is one who renders service in the course of an independent employment or oc-

cupation, following his employer's desires only as to the results of the work, and not as to the means whereby it is to be accomplished (*McDonald* v. *Shell Oil Co.*, 44 Cal.2d 785, 788 [285 P.2d 902]; Lab. Code, § 3353; Rest.2d Agency, § 2). ■ The most important factor of an agency or employee relationship, as distinguished from that of independent contractor, is the *right* to control the manner and means of accomplishing the result desired. ■ Strong evidence of the employer's control is his right to discharge at will, without cause (*California Emp. Com.* v. *Los Angeles etc. News Corp.*, 24 Cal.2d 421, 425 [150 P.2d 186]; see also *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 43 [168 P.2d 686]; *City of Los Angeles* v. *Vaughn*, 55 Cal.2d 198, 201 [10 Cal.Rptr. 457, 358 P.2d 913]). ■ Other factors to be considered are: (a) whether services performed are a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required; (d) who supplies the instrumentalities, tools and the place of work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee (*Sparks* v. *L. D. Folsom Co.*, *supra*, at pp. 284-285).

■ The uncontroverted evidence indicated that Pacific had unconditionally purchased the airlift machinery from Gordon under an agreement which admittedly did not require Gordon to make tests of the equipment. Pacific did not request any tests until after its agreement with Gordon was signed. Pacific asked for the test because of its doubts about the ability of the Gordon machinery to perform. The failure of each successive test apparently increased Pacific's determination for another test before the airlift machinery was shipped overseas.

As Pacific's contract with Pomeroy required the unloading of the cement into the silos in Guam, the entire purpose of the test was to assure Pacific that the machinery already purchased from Gordon could perform satisfactorily, so that Pacific could keep the delivery schedule promised to Pomeroy, by shipping the cement in its regularly scheduled cargo vessels instead of its special cement vessels. Time was of the essence in Pacific's agreement with Pomeroy.

 Pacific consulted with Mr. Lang of Ideal because of his extensive experience in the cement industry. The fact that Ideal did not charge Pacific for the use of its facilities and employees and that the test was also of some incidental benefit to Ideal since the airlift machinery, if satisfactory, had the potential of revolutionizing the bulk cement shipping industry, does not conclusively rule out an agency relationship between Pacific and those performing the test.

 After Gordon was unable to comply with Pacific's request for a test site, Pacific undertook to make all of the arrangements for the test on Ideal's premises with some of the equipment Pacific had purchased from Gordon, as well as additional pipe acquired by Pacific specifically for the test. Although Pacific was not present at the precise moment when appellant was injured, the uncontroverted evidence established that Pacific's engineer, Novitski, was in charge of coordinating the activities of Ideal and Gordon in preparing for the test and Pacific had ordered several of its employees to observe the operation as they had at the prior tests.

The test was conducted for Pacific's benefit on Ideal's premises with Pacific owned equipment and by Ideal's employees working under the direction of Gordon's employee. Under these facts, it cannot be said as a matter of law that Ideal and Gordon were independent contractors. A jury could conclude that they were independent contractors or that Pacific had temporarily borrowed Ideal's facilities and employees and that an agency or employer-employee relationship existed between them and Pacific (*Woodall* v. *Wayne Steffner Productions, Inc.,* 201 Cal.App.2d 800, 808 [20 Cal. Rptr. 572]; Rest.2d Agency, §§ 226-227; *Moss* v. *Chronicle Publishing Co.,* 201 Cal. 610 [258 P. 88, 55 A.L.R. 1258]).

Here, although Camblin directed the activities of appellant and the crane operator, Green, a jury might reasonably infer that all three were subject to Pacific's orders. Pacific had the authority to call off the test and apparently did so after the accident occurred. It is not necessary that the principal exercise his right of control or that there be actual supervision of the work of an agent. Rather, it is the existence of the right to control that establishes an agency and distinguishes it from an independent contractor relationship (*Malloy* v. *Fong, supra,* at p. 370.)

 We are satisfied that the above evidence with the inferences which the jury could have drawn therefrom would

have supported a finding that Pacific exercised a sufficient right of control over the test and its equipment to create an agency. This conclusion is sufficient in itself to require a reversal. However, the necessities of a new trial constrain us to consider the other question presented.

## II THE NEGLIGENCE OF CAMBLIN

Respondent next argues that there was no evidence from which the jury could infer any negligence on the part of Camblin. It is uncontroverted that appellant and Green were working under the direction of Camblin. Green operated the crane under the sole direction of Camblin. While there was some evidence that the crane control mechanism was defective, there was also evidence to the contrary. Apparently Camblin requested the crane but there is no indication that he specified its size or the weight of the airlift motor and its parts. There was evidence that the size of the crane used was too large for the job involved. It is arguable that the platform selected by Camblin was too small to accommodate the machinery and men. The jury might conclude that the factors mentioned above contributed to the injuries incurred.

The evidence also established, as stated above, that Pacific had unconditionally purchased the airlift machinery. Gordon was to send Camblin, its chief engineer, to Guam with the airlift. Pacific arranged to have Camblin run the test at Ideal. We think a jury could infer that Camblin was acting as the agent of Pacific as well as Gordon and was negligent in some aspect of the operation involving the crane.

A principal is liable for the torts of his agent conducted within the scope of his authority. Although the appellant here recovered workmen's compensation from Ideal, appellant's right of recovery against Pacific is not affected by the fact that Pacific had entered into a legal relationship with Ideal (*Baugh* v. *Rogers,* 24 Cal.2d 200 [148 P.2d 633, 152 A.L.R. 1043]; *Van Meter* v. *Reed,* 207 Cal. App.2d 866 [24 Cal.Rptr. 688]). An employee's recovery on a claim for compensation against his employer does not affect the employee's right of action against any other party whose negligence proximately contributes to the injury involved (Lab. Code, § 3852). In the instant case, Ideal was properly given notice of this action against Pacific (Lab. Code, § 3853). The matter should be submitted to the jury

under a proper instruction based on *Witt* v. *Jackson,* 57 Cal. 2d 57 [17 Cal.Rptr. 369, 366 P.2d 641].

Judgment reversed.

Shoemaker, P. J., and Agee, J., concurred.