[No. D003705. Fourth Dist., Div. One. July 29, 1986.]

EVANGELIA BROSE, Plaintiff and Appellant, v.
UNION-TRIBUNE PUBLISHING COMPANY,
Defendant and Respondent.

COUNSEL

Kim Newbrough and Matthew G. Markham for Plaintiff and Appellant.

Hollywood & Neil, Bruce E. Sulzner and Anton C. Gerschler for Defendant and Respondent.

OPINION

**BUTLER, J.**—Elaine Doucette, a regular newspaper carrier for the San Diego Evening Tribune, went on vacation. She hired Nancy Lawson to deliver the Tribune in her absence. Tribune subscribers on Doucette's route lived on narrow country roads with hills and many turns. Doucette was authorized by the Tribune to use her car to deliver the papers and Lawson used her own car while substituting for Doucette. One July afternoon, Lawson, after delivering a newspaper to a mailbox situated on the left side of the roadway and going into a leftward curve, collided with and injured Evangelia Brose, who was driving in the opposite direction, toward Lawson.

Brose sued Lawson, her husband Bill and the Union-Tribune Publishing Company, publisher of the Tribune (the Company). The Lawsons settled with Brose, leaving the Company as the only remaining defendant in the lawsuit. The Company moved for summary judgment, contending Doucette and hence Lawson were independent contractors and not employees and Lawson's negligence was not imputable to the Company. The judge granted the motion and dismissed the complaint. Brose appeals. We find triable issues of fact and reverse.

I

Summary judgment is a drastic procedure, should be used with caution (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 852 [94 Cal.Rptr. 785, 484 P.2d 953]) and should be granted only if there is no issue of triable fact (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822]; Code Civ. Proc., § 437c, subds. (a) and (c)).

Brose contends Doucette was an employee of the Company, not an independent contractor.

■ Whether a person is an employee or an independent contractor is ordinarily a question of fact but if from all the facts only one inference may be drawn it is a question of law. (*Baugh* v. *Rogers* (1944) 24 Cal.2d 200,

206 [148 P.2d 633, 152 A.L.R. 1043]; *Housewright v. Pacific Far East Line, Inc.* (1964) 229 Cal.App.2d 259, 265-266 [40 Cal.Rptr. 208]; *Yucaipa Farmers etc. Assn. v. Ind. Acc. Com.* (1942) 55 Cal.App.2d 234, 238 [130 P.2d 146].)

"One of the best tests to determine whether the relation is that of an independent contractor or that of employer and employee is the right of control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent. [Citation.] It is not a question of interference, or non-interference, not a question of whether there have been suggestions, or even orders, as to the conduct of the work; but a question of the right to act, as distinguished from the act itself or the failure to act." (*Hillen v. Industrial Acc. Com.* (1926) 199 Cal. 577, 581-582 [250 P. 570]; see also *Globe Indemnity Co. v. Industrial Acc. Com.* (1930) 208 Cal. 715, 718 [284 P. 661]; *Press Pub. Co. v. Industrial Acc. Com.* (1922) 190 Cal. 114, 121 [210 P. 820].) ■ Indicative of the right to control is the degree of control over the means of doing the work as opposed to an interest only in the result, the extent to which a worker would have to obey company instructions, and further, the ability of the alleged employer to terminate at will the person performing the services. (*Burlingham v. Gray* (1943) 22 Cal.2d 87, 99-102 [137 P.2d 9].)

The Company, relying heavily on *Fleming v. Foothill-Montrose Ledger* (1977) 71 Cal.App.3d 681 [139 Cal.Rptr. 579], claims it only was interested in the result of the work, i.e., the delivery of its newspaper; it claims it exercised no control over its carriers, here Doucette, in the way the work was performed; it did not require certain ways and means of delivery, such as how to fold the paper, how to drive the route; carriers have to get and train their own substitutes and do not get wages or a salary.[1]

Arguing *Fleming* controls as it sets forth the law, the Company would have us follow it blindly; Brose urges we must distinguish it. The *Fleming* holding relies on several old appellate court cases where the newspaper carriers were found to be independent contractors as a matter of law (*Batt v. San Diego Sun Pub. Co., Ltd.* (1937) 21 Cal.App.2d 429 [69 P.2d 216]; *Bohanon v. James McClatchy Pub. Co.* (1936) 16 Cal.App.2d 188 [60 P.2d 510]; see also an additional case, *Rathbun v. Payne* (1937) 21 Cal.App.2d 49 [68 P.2d 291]) and it distinguishes one Supreme Court case, *Press Pub. Co. v. Industrial Acc. Com., supra,* 190 Cal. 114, where the court had

[1]Lawson's status is dependent on Doucette's status. If Doucette is an independent contractor, the connection between the Company and Lawson is severed. (*Burlingham v. Gray, supra,* 22 Cal.2d 87 at p. 103.)

upheld workers' compensation benefits for a newspaper carrier finding there was substantial evidence he was an employee (at p. 124).[2]

Our own research has turned up two Supreme Court cases where the court in similar circumstances found a newspaper carrier and a dealer could be employees and the issue should have been left to the jury. In *Robinson* v. *George* (1940) 16 Cal.2d 238 [105 P.2d 914], the court reversed a nonsuit in favor of the newspaper and in *Burlingham* v. *Gray, supra,* 22 Cal.2d 87, it reversed a directed verdict where the trial court had found, as a matter of law, a dealer who employed other carriers to be an independent contractor.

Other jurisdictions are split on the issue whether a newspaper carrier is an independent contractor rather than an employee as a matter or law or an issue of fact. (See 55 A.L.R.3d 1216 et seq.—approximately a 50-50 split vis-à-vis employee/independent contractor status in the cases listed there.)

█ We turn to Doucette's agreement with the Company. Title to the newspapers passes to the carrier upon delivery; Doucette paid wholesale $12.63 per hundred for the weekday paper and $16.25 for the Sunday paper; she had to assemble the newspapers "properly" and deliver them regularly; to arrange personally for a substitute and to pay such a substitute separately; and to maintain a list of subscribers which would not be disclosed to others without the Company's consent. Doucette had no right to "sell" the route; she had to furnish a bond to guarantee "faithful performance;" and finally, the agreement could be terminated by either party in 30 days or by the Company immediately if Doucette violated the "agreement in any way." The agreement also contained a provision she could not use an automobile; however, Doucette apparently was excepted from that, certain routes being considered automobile routes, and she being an adult.

The agreement is cursory; certain matters are spelled out but we find many other factors contribute to the Company/Doucette relationship. █ While the parties' relationship is partially expressed in the writing, the determination of the true relationship should also take into consideration "'the conduct of the parties while the work is being performed'" (*Burling-*

---

[2]Independent contractor versus employee status comes up in a variety of situations (see 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, §§ 10 & 11, pp. 649-651). We observe here the workers' compensation law codified the definition of independent contractor in 1917 (Stats. 1917, ch. 586, p. 835); this definition is unchanged (see Lab. Code, § 3353; see Stats. 1937, ch. 90, p. 267). In 1931 the act specifically excluded "any person engaged in vending, selling . . . any newspaper, magazine or periodical where the title to such newspaper . . . has passed to the person so engaged" (Stats. 1931, ch. 1021, p. 2068). This provision was deleted in 1974 (Stats. 1974, ch. 966, p. 2013; Lab. Code, § 3352).

*ham* v. *Gray, supra,* 22 Cal.2d 87 at pp. 93-94), especially where as here a third party is involved and injured because of alleged negligence of the carrier (*id.,* at p. 93).

 We consequently look at the additional evidence in the depositions and declarations presented to the trial court. Doucette was required to properly assemble the newspapers and to deliver them "as soon after receipt as possible." Some customers called Doucette and others the Company when they wished to be deleted or added because of vacations. New subscribers often called the Company; some called her. Doucette picked up the newspapers at a certain place. Doucette submitted no reports but upon request she was required to furnish the Company with a list of new subscribers. She had to finish the route by 4:30 p.m. Customers called her or the Company if they had complaints; the Company relayed information to Doucette, i.e., *where* to deliver the papers. Sonsteng, the district manager of the Company, specifically agreed to pay Lawson using prewritten checks made out by Doucette. Customers had the option to make payments either to Doucette or to the Company directly, the Company crediting Doucette's account with payments made to it directly. Doucette could otherwise choose her own collection method. The Company generally determined whether an automobile should be used.

If Doucette ran out of papers either she or the Company would deliver them later. She had no leeway in the amount of the bond she had to put up. She would have to get clearance to enlarge her route. The Company decided where to drop off the papers, although there was a possibility they could use her house; the Company pays for the space to drop off the papers. Doucette could fold the papers the way she wanted to or put them in plastic as the weather required; however, would most likely lose the route if she failed to do so when it was raining. Sonsteng stated people usually called the Company if there was a failed delivery; he would then deliver it or ask a carrier to do so. The carriers who use a car must have insurance. The carriers must pay for their papers by the 7th of the month. It is the district manager's responsibility to teach a carrier a route if the previous carrier on the route does not do it. He decides whether it is an automobile route. He also may train a carrier, i.e., how to fold and put rubberbands around the paper. The Company had a policy concerning the papers' placement: on the bicycle routes, on the porch; on the automobile routes, the driveway. Carriers bought polybags and rubberbands from the Company but did not have to.

In *Burlingham* v. *Gray, supra,* 22 Cal.2d 87, a party was killed in a collision with a newspaper carrier who was working for a dealer for a publishing company. At issue was the status of the dealer as either employee

or independent contractor vis-à-vis the publishing company, it being conceded the dealer "employed" the carrier. If the dealer was an employee, the publishing company could be held liable on the theory of respondeat superior for the carrier's negligence. The contract declared the party was a dealer; he made his money on the difference between wholesale and retail price, which the company controlled; he had to furnish a bond; could not sell or transfer the rights under the agreement; the company could terminate his services at any time for unsatisfactory performance. Furthermore, the agreement declared the dealer was engaged in an "independent business" (*id.*, at pp. 90-93). On these facts, similar to those here, the court reversed a directed verdict and held the jury should have been permitted to decide whether in fact the dealer was an employee (*id.* at p. 103).

Admittedly, other cases using the same criteria have come to contrary conclusions. It is, however, not necessary to distinguish each on their particular facts; concededly the cases are similar. However, "[w]hile these tests are recognized as helpful, yet no special test, or fact, or circumstance has been found to give a conclusive answer to the question, and in the last analysis each case must turn upon its own peculiar facts and circumstances." (*Schaller* v. *Industrial Acc. Com.* (1938) 11 Cal.2d 46, 52 [77 P.2d 836].)

A particular aspect of the right to control is the employer's right to discharge at will. In *Press Pub. Co.* v. *Industrial Acc. Com., supra,* 190 Cal. 114, the court said: "This power of the employer to terminate the employment at any time is a strong circumstance tending to show the subserviency of the employee, since it is incompatible with the full control of the work usually enjoyed by an independent contractor. Perhaps no single circumstance is more conclusive to show the relationship of an employee than the right of the employer to end the service whenever he sees fit to do so." (At pp. 119-120; see also *Burlingham* v. *Gray, supra,* 22 Cal.2d 87 at p. 101.)

Doucette could be discharged without cause with 30 days' notice and without notice if she violated the agreement in any way. In both *Press Pub. Co.* v. *Industrial Acc. Com., supra,* at p. 120, and *Burlingham* v. *Gray, supra,* 22 Cal.2d at p. 92, the agreements provided the company could terminate the carriers at will with "unsatisfactory" service which the courts found indicative of an employer/employee relationship. Conversely, the court in *Fleming* v. *Foothill-Montrose Ledger, supra,* 71 Cal.App.3d 681, opined 14 days' notice to terminate by either party if "services provided for do not prove satisfactory" (*id.*, at p. 686, fn. 4) did not give the company enough right of control so as to render the carrier an employee. We side with *Press Pub. Co.* v. *Industrial Acc. Com.* and *Burlingham* v. *Gray.* The agreement here as noted is cursory; from the depositions and declarations

it is evident there were many aspects of the relationship not written expressly into the signed agreement. Arguably, if Doucette violated these unwritten requirements, she could be terminated at any time. (See *Burlingham* v. *Gray, supra,* 22 Cal.2d at p. 102.) With the advent and rise of the doctrine of wrongful discharge and the erosion of the concept of employment "at will" (see *Cleary* v. *American Airlines, Inc.* (1980) 111 Cal.App.3d 443, 448-453 [168 Cal.Rptr. 722]), freedom from immediate discharge with or without cause does not necessarily negate employee status.

Another basis for determining whether control exists is manner of payment. Since Doucette did not get paid a salary but received her financial benefit from the difference between wholesale and retail price, the Company further argues Doucette is an independent contractor as a matter of law (*Fleming* v. *Foothill-Montrose Ledger, supra,* 71 Cal.App.3d 681 at p. 687); moreover, the Company did not withhold social security or taxes. However, these arrangements are not controlling issues; "'the relationship must be determined from the whole situation and *not* from isolated facts considered as constituting the whole.'" (*Burlingham* v. *Gray, supra,* 22 Cal.2d 87 at p. 103, quoting from *Rathbun* v. *Payne, supra,* 21 Cal.App.2d 49 at p. 51, our italics.) In *Burlingham,* a similar financial arrangement was not considered determinative (22 Cal.2d 87 at pp. 90-91, 100-101; see also *Riskin* v. *Ind. Acc. Com.* (1943) 23 Cal.2d 248, 253 [144 P.2d 16] [manner of payment not conclusive]; *Graetch* v. *Dix* (1945) 68 Cal.App.2d 115, 119 [156 P.2d 79]).

In light of the cases and the array of conflicting evidence, we think it a triable issue of fact whether the Company had the right to control Doucette even though it might not have specifically exercised this right. (*Burlingham* v. *Gray, supra,* 22 Cal.2d 87 at p. 103; *Robinson* v. *George, supra,* 16 Cal.2d 238 at p. 247; see also *George* v. *Chaplin* (1929) 99 Cal.App. 709, 713 [279 P. 485] [where the writing is not intended to be a complete statement of the manner and mode of doing the work and where different conclusions may be drawn, it is a matter for a jury to decide].) In the case at bar, the evidence if presented at a trial would show Doucette did not buy or lease the route and she could not "sell" the route. She had to properly assemble and deliver the newspapers by a certain time; she had to maintain a list of subscribers which upon request she had to furnish to the Company, and she could not disclose the list to anyone without the Company's consent; she could stop doing the route with 30 days' notice to the Company; they could likewise terminate her without cause with notice but could also do so without notice *for* cause. Title passed to her upon delivery of the papers.[3] She had

---

[3]The contract provides title passes upon delivery. This by itself is ambiguous; the Company doubtlessly would argue it means when it delivers papers to Doucette; however, Brose could with some logic argue this is not clear and could mean upon delivery to customers.

to abide by laws and "good newspaper practice" in carrying out her duties. She could do the route at her convenience but had to finish by 4:30 p.m.; when something went wrong, Sonsteng, an employee of the Company, would help out or take over. While this is not a complete recitation of the evidence, we find the circumstances here present triable issues of fact. Again we reiterate, "in the last analysis each case must turn upon its own peculiar facts and circumstances." (*Schaller* v. *Industrial Acc. Com., supra,* 11 Cal.2d 46 at p. 52.)[4]

We do not think newspaper publishers should be insulated from liability involving newspaper carriers by simply arranging compensation to be the difference between wholesale and retail price, by avoiding the appearance of "control" and by not specifying, for example, exactly how a paper should be folded or delivered. The reality is different.[5] We conclude the jury should decide the relationship between the carrier of the newspaper and the publisher.

### Conclusion

We reverse the summary judgment finding triable issues of fact regarding Doucette's status as either employee or independent contractor. As there was no separate motion for summary adjudication of issues, we need not consider the remaining contentions.

Judgment reversed.

Staniforth, Acting P. J., concurred.

**LEWIS, J.,** Dissenting.—I respectfully dissent. There are no facts concerning the terms of the contractual arrangement between the Union-Tribune

---

[4]To illustrate the array of additional cases coming to different conclusions: *New York Indem. Co.* v. *Indus. Acc. Com.* (1931) 213 Cal. 43 [1 P.2d 12] [newsboys selling on street corners independent contractors]; followed in *Hartford A. & I. Co.* v. *Indus. Acc. Com.* (1932) 123 Cal.App. 151 [10 P.2d 1035]; not followed in *Associated Indem. Corp.* v. *Indus. Acc. Com.* (1932) 128 Cal.App. 104 [16 P.2d 774]; *Globe Indemnity Co.* v. *Industrial Acc. Com., supra,* 208 Cal. 715 and *Call Pub.* v. *Industrial Acc. Com.* (1928) 89 Cal.App. 194 [264 P. 300] [carriers were found to be employees based on similar facts, compensation being a distinguishing feature]; *State Comp. Ins. Fund* v. *Indus. Acc. Com.* (1932) 216 Cal. 351 [14 P.2d 306] [following *New York Indem. Co.* v. *Indus. Acc. Com.* in finding a newspaper carrier an independent contractor]. A more recent case, *Taylor* v. *Industrial Acc. Com.* (1963) 216 Cal.App.2d 466 [30 Cal.Rptr. 877], finds the carrier was not on the facts there an employee.

[5]We judicially notice the morning newspaper is as essential to the beginning of a civilized day as is the crow of the cock. A newspaper undelivered triggers a tirade to the hapless circulation department and later delivery is best done by stealth to avoid a battery, obviously justifiable.

Publishing Company and Elaine Doucette which are in dispute. The only question is whether a contract with those undisputed terms make an employer-employee relationship or an independent contractor relationship. That question appears to me to be a question of law. To treat it as a question of fact for a jury would permit a jury in one case to conclude the contract creates an employer-employee relationship and in the next case to conclude the same contract creates an independent contractor relationship. What the majority are saying is that courts have been unable to agree on the correct legal conclusion to be drawn from facts like these, so we should let a jury decide and whichever way they decide, that will be all right. I believe the trial judge relied correctly on *Fleming* v. *Foothill-Montrose Ledger* (1977) 71 Cal.App.3d 681 [139 Cal.Rptr. 579], and I would affirm.

Respondent's petition for review by the Supreme Court was denied November 20, 1986. Panelli, J., was of the opinion that the petition should be granted.